# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                    No. CR 03-2170 JB

ALEJANDRO BALDERAMA,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Sealed Motion Requesting Contact Visit, filed July 18, 2014 (Doc. 79)("Contact Motion"); (ii) the Opposed Request for an Evidentiary Hearing, filed July 23, 2014 (Doc. 83)("Motion for Hearing"); and (iii) the request in the Defendant's Sealed Sentencing Memorandum, filed July 18, 2014 (Doc. 80)("Sentencing Memo."), that the Court run Defendant Alejandro Balderama's sentence for violating the conditions of his supervised release concurrently with a state-court criminal sentence that he received for the same conduct. The Court held a hearing on July 25, 2014, which the Court adjourned and then completed on September 10, 2014. The primary issues are: (i) whether to permit Balderama to have a contact visit with his ill sister; (ii) whether to hold an evidentiary hearing to determine the proper sentence to impose upon Balderama for his violations of supervised release; and (iii) whether to impose Balderama's sentence for violating his supervised-release conditions concurrently with his state-court sentence arising from the same crime. Because the Court takes seriously the concerns of prison administrators on such topics, the Court will deny the Contact Motion and leave the issue to the discretion of the United States Marshals Service. Because facts important to the sentencing determination are reasonably in

dispute, the Court will grant the Motion for Hearing and hold an evidentiary hearing to ascertain these facts.  Last, because of the severity of Balderama's violations and his past criminal history, because the Guidelines sentencing range for his violations is well above the statutory maximum, and because the Court will not impose another term of supervised release, the Court will not run Balderama's sentence for violating his conditions of supervised release concurrently to his state-court criminal sentence.   The Court will, therefore, impose a sentence of 24-months imprisonment, to be served consecutively to his state-court term of imprisonment.

## FINDINGS OF FACT

The Court will first outline Balderama's past criminal history.  Second, the Court will describe some of Balderama's other personal characteristics.  Third, the Court will describe the crime -- being a felon in possession of a firearm -- that put Balderama in front of the Court in the first instance.  Last, the Court will set forth the facts of Balderama's multiple violations of the conditions of his supervised release.   The Court finds all facts by a preponderance of the evidence, as 18 U.S.C. § 3583(e)(3) requires.  The Federal Rules of Evidence do not bind the Court at sentencing, see Fed. R. Evid. 1101(d)(3) ("These rules -- except for those on privilege -- do not apply to the following: . . . sentencing."), and the Court may, accordingly, consider evidence that would not be admissible under the rules, including hearsay, see 18 U.S.C. § 3661; U.S.S.G. § 6A1.3(a), but it will factor evidentiary infirmities into the weight that it accords various evidence.

### 1.     Balderama's Criminal History Up to and Including the Underlying Crime of Conviction in This Case.

1.     Balderama was convicted of two counts of burglary in the Children's Division of the 13th Judicial District Court of New Mexico in 1997, at age 16, which imparts no criminal

history points.  See Presentence Investigation Report ¶ 24, at 6 (disclosed October 21, 2005) ("PSR").

2.     Balderama was convicted of robbery, conspiracy to commit robbery, aggravated battery, an aggravated assault in the 13th Judicial District Court of New Mexico in 1999, at age 18, and incarcerated for two years, which indicates 3 criminal history points.  See PSR ¶ 25, at 7.

3.     Balderama was convicted of a string of four misdemeanors in the Grants, New Mexico Magistrate Court in 2002 -- (i) concealing identity; (ii) resisting, evading, or obstructing an officer; (iii) driving while on a suspended license; and (iv) battery -- only the last of which indicates any criminal history points, and it imparts 1 point.  See PSR ¶¶ 26-29, at 8.

4.     Balderama was convicted of four counts in the Thirteenth Judicial District Court of New Mexico in 2003 -- (i) shooting at an inhabited dwelling or occupied building; (ii) shooting at or from a motor vehicle; (iii) possession of a firearm as a felon; and (iv) receiving or transferring a stolen vehicle -- and sentenced to two-years parole concurrent to five-years probation, which receives 3 criminal history points.  See PSR ¶ 30, at 9.

5.     While Balderama was in jail on his 2003 conviction, he escaped from custody, earning convictions for escape from jail and conspiracy to escape from jail, for which he was sentenced to thirty-months imprisonment; this crime receives 3 criminal history points.  See PSR ¶ 32, at 10.

6.     These crimes added up to a total of 12 criminal history points before the underlying offense of conviction in this case is added.  See PSR ¶ 33, at 10.

7.     The underlying crime in this case is being a felon in possession of a firearm, and the Court sentenced Balderama to 70-months imprisonment and three-years supervised release. See Judgment at 1-3, filed November 16, 2005 (Doc. 51).

8.     In addition to these convictions, Balderama was also arrested four other times before being arrested for the underlying crime of conviction in this case.  See PSR ¶¶ 35-38, at 10-11.

**2.     Balderama's Personal Characteristics.**

9.     Balderama was born on December 31, 1979, in Grants, and he had very little contact with his biological father; his step-father, Manuel Montonio, raised him.  See PSR ¶ 40, at 11-12.

10.     Balderama has never been married, has no children, and has no history of physical or mental health problems.  See PSR ¶¶ 41-43, at 12.

11.     Balderama declined to answer questions regarding substance abuse.  See PSR ¶ 44, at 12.

12.     Balderama dropped out of school in the eighth grade and did not return, he has never held down a job, and he has "no income, no assets, and no liabilities."  PSR ¶ 47, at 13. See PSR ¶¶ 45-46, at 13.

13.     Balderama is or was a member of the Syndicato Nuevo Mexico prison gang, as the tattoos on his neck indicate.  See PSR ¶ 42, at 12.

**3.     The Underlying Crime of Conviction.**

14.     On January 3, 2003, Balderama was arrested for possession of a double-barrel, 12-gauge shotgun with a barrel length of less than eighteen inches and no serial number.  See PSR ¶ 9, at 3.

15.     Witnesses observed Balderama putting the gun in his vehicle, where police later recovered it.  See PSR ¶ 9, at 3.

16.     Officers also found shotgun shells for the gun in Balderama's jacket, and Balderama's fingerprints were on the gun.  See PSR ¶¶ 9-10, at 3.

**4.     Balderama's Violations of Supervised Release.**

17.     Balderama violated the conditions of his supervised release in three ways -- committing an assault on a correctional officer, failing two drug tests, and failing to attend substance-abuse counseling and random drug testing -- but the Court cannot find, by a preponderance of the evidence, that Balderama committed the murder of which the Plaintiff United States of America accuses him.  See Amended Petition for Revocation of Supervised Release, filed April 16, 2014 (Doc. 64)("Petition").

**a.     Drug Violations.**

18.     One of the conditions that the Court imposed upon Balderama as a part of his supervised release states that "[t]he defendant must participate in and successfully complete a substance abuse treatment program which may include drug testing, outpatient counseling, or residential placement."  Judgment at 4.

19.     On September 26, 2011, Balderama failed, without excuse, to attend a scheduled substance-abuse counseling session.  See Petition at 1; Sentencing Minute Sheet on Violation of Supervised Release, filed June 19, 2014 (Doc. 75)("Guilty Plea")(pleading guilty to all of the Petition's allegations).

20.     On October 24, 2011, Balderama failed, without excuse, to report for random drug screening.  See Petition at 1; Guilty Plea at 1.

21.     Another condition that the Court imposed on Balderama as a part of his supervised release is that he must "refrain from the use and possession of alcohol and other

forms of intoxicants," Judgment at 4, and "refrain from any unlawful use of a controlled substance," Judgment at 3.

22.     On August 2, 2011, and August 10, 2011, Balderama tested positive for marijuana use during a drug screening.  See Petition at 1; Guilty Plea at 1.

23.     On September 28, 2011, Balderama tested positive for methamphetamine use during a drug screening.  See Petition at 1; Guilty Plea at 1.

        **b.      Alleged Murder.**

24.     One of the conditions that the Court imposed on Balderama as a part of his supervised release is that he "not commit another federal, state, or local crime."  Judgment at 3.

25.     A man named Ernest Villa was killed by a single gunshot to the face in his mobile home on November 7, 2011.   See Transcript of Hearing at 27:10-28:8 (taken July 25, 2014)("July 25 Tr.")(Sanchez, Valencia).[1]

26.     Villa was a high-ranking member of the same gang to which Balderama belongs or belonged.  See July 25 Tr. at 53:18-24 (Lopez, Sanchez).  See also July 25 Tr. at 23:24-4 (Court, Valencia)("Why would he kill a high ranking member of his own . . . gang? . . . Because there is infighting in the gang.  [Balderama] himself said that it was a drug situation.").

27.     Balderama was at Villa's mobile home when Villa was murdered.  See Letter from Balderama to the Court at 1, filed July 18, 2014 (Doc. 80-1)("Balderama Letter"); Criminal Complaint at 1, filed July 23, 2014 (Doc. 82-1).

28.     Balderama states that multiple men entered the trailer while he was inside with Villa and began shooting at Balderama.  See Balderama Letter at 1.

---

[1]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final versions may contain slightly different page and/or line numbers.

29.     Balderama states that he ran "to the last room" of the trailer "and jumped out the window," and that the men fired multiple shots, some of which killed Villa.  Balderama Letter at 1.

30.     Three other witnesses -- Viviana Gulindo, Patrick Dominquez, and Grisel Perez -- assert that Balderama killed Villa, but none of these witnesses testified before the Court, were subject to cross-examination, or offered sworn affidavits, and the Court received their statements only secondhand from Detective Jose Sanchez, who investigated the murder.  See July 25 Tr. at 38:2-57:21 (Sanchez, Valencia, Lopez).

31.     Sanchez is an experienced officer and investigator; he has worked in law enforcement for nineteen years, thirteen of them as a detective.  See July 25 Tr. at 26:18-25 (Valencia, Sanchez).

32.     Gulindo told Sanchez that she was Balderama's girlfriend, and that she was present in the trailer when Balderama pulled out a gun and shot Villa in the head.  See July 25 Tr. at 29:13-15 (Valencia, Sanchez); id. at 29:17-30:1 (Sanchez).

33.     Gulindo was, however, either drunk or high on drugs at the time of the murder. See July 25 Tr. at 50:6-9 (Lopez, Sanchez).

34.     G. Perez told Sanchez that she was Villa's girlfriend, and that she "observed a gentleman with a 505 [tattooed] on his chin . . . c[o]me into the living room and sho[o]t both her brother," J. Perez, and Villa.[2]  July 25 Tr. at 30:3-31:6 (Sanchez).

_____

[2]G. Perez may have also told Sanchez that she observed Balderama shoot J. Perez's girlfriend, Megan Ortiz; a combination of Sanchez' ambiguous pronoun usage and the court reporter's errors prevent the Court from being able to find this fact by a preponderance of the evidence: "She said that he came into the living room and shot both her brother and who is girlfriend which is Megan Ortiz and I'm mail Perez.  She said that she observed I'm may persist trying to get Megan up off the floor and run out the front door."  July 25 Tr. at 30:18-21 (Sanchez).

35.     Balderama has a "505" tattoo on his chin.  July 25 Tr. at 31:7-14 (Valencia, Sanchez).[3]

36.     G. Perez also told Sanchez that she took her child from the mobile home and ran from Balderama, and that Balderama shot at her multiple times as she ran to a neighbor's home. See July 25 Tr. at 30:23-31:6 (Sanchez).

37.     Dominguez told Sanchez that he is Megan Ortiz' cousin, and that, while he was not inside the mobile home at the time of the killing, he heard the shots, approached the dwelling, and found Ortiz lying, with a gunshot wound, outside the mobile home.  See July 25 Tr. at 32:2-12 (Sanchez).

38.     Dominguez told Sanchez that, while driving Ortiz to the hospital, Ortiz told Dominguez that Balderama had shot her.[4]  See July 25 Tr. at 32:13-16 (Sanchez).

---

[3]Here, the United States' reliance on hearsay causes the Court to not give much weight to give this evidence.  G. Perez did not know or recognize Balderama, but merely told Sanchez identifying information about Balderama's physical appearance.  "505" chin tattoos are not common, but "505" stands for Albuquerque, New Mexico's telephone area code, and area codes are often used as gang slang for the geographic footprint they encompass.  Such a tattoo is not all that unique, although the location on the body is unusual.  G. Perez also identified a number of other tattoos that the United States failed to ever link back to Balderama -- indicating membership in the Sindicato Nuevo Mexico gang -- but these tattoos, as well, are common among members of this gang.

[4]Again, pronoun ambiguity and transcript errors weaken this Finding of Fact's significance -- in addition to its infirmity as double hearsay.  The transcript states: "Q.  Did he mention anything in regard to Mr. Balderama?  A.  He stated is that Mr. Balderama while he was outside had fired several shots in his direction."  July 25 Tr. at 32:13-16 (Sanchez).  This statement could have one of two meanings: either Dominguez told Sanchez that Ortiz told Dominguez that Balderama had shot her; or Dominguez told Sanchez that Dominguez had personally observed Balderama shooting outside the mobile home.  The Court thinks the first explanation is more likely, as it seems unlikely that Dominguez and Ortiz drove to the hospital together -- and likely had contact after she arrived at the hospital but before Dominguez talked to Sanchez -- without discussing the identity of her shooter.  Either way, this Finding of Fact constitutes indirect, hearsay evidence that Balderama was Villa's shooter.

- 8 -

39.     Sanchez interviewed Balderama, who initially told Sanchez that "he didn't know nothing about anything," but, eventually, Balderama told Sanchez the same story he told the Court in the Balderama Letter, i.e., that he was in the mobile home with Villa when a number of strangers showed up -- apparently to conduct a drug transaction -- and killed Villa.  July 25 Tr. at 34:8-21 (Sanchez).

40.     While in custody for the murder charge, one of Balderama's telephone calls was secretly taped, in which Balderama described Villa's killing in a way that was "a little bit different" from the way that Balderama had described it to Sanchez, but in which the major points -- including that Balderama did not kill Villa -- were "pretty close to what [Balderama] had told [Sanchez]."  July 25 Tr. at 36:6-10 (Sanchez).

41.     Sanchez did not interview either J. Perez or Ortiz -- the two other individuals whom Balderama allegedly shot on November 7, 2011.  See July 25 Tr. at 40:6-17 (Lopez, Sanchez).

42.     J. Perez and Ortiz both told another sheriff's deputy -- whose last name is Valencia -- that they did not "know or see who shot [them]."  July 25 Tr. at 41:4-7 (Lopez, Sanchez).  See July 25 Tr. at 42:18-22 (Lopez, Sanchez).

43.     The State of New Mexico charged Balderama with second-degree murder of Villa, but the charges were dismissed, because Sanchez was unable to find any of his witnesses again.  See July 25 Tr. at 32:25-33:7 (Sanchez, Valencia).

44.     Balderama waived his preliminary hearing, so the charges against him have never been tested in court.  See July 25 Tr. at 32:21-22 (Sanchez, Valencia).

45.     The Court cannot find, by a preponderance of the evidence, that Balderama killed Villa.[5]

####        c.        Assault Conviction.

46.     One of the conditions that the Court imposed on Balderama as a part of his supervised release is that he "not commit another federal, state, or local crime."  Judgment at 3.

47.     While Balderama was in custody for the murder charge, he assaulted a correctional officer with a metal pole.  See July 25 Tr. at 19:25-20:2 ("THE COURT:  So you

---

[5]A murder charge is, obviously, a very serious accusation, and the Court is uncomfortable relying on an assortment of hearsay that reproduces Sanchez' one-time encounters with various witnesses of unknown gang affiliation and dubious credibility.  The Court, thus, cannot find that Balderama committed homicide -- even under a preponderance standard, and even without strictly honoring the hearsay rules.  The Court does not distrust Sanchez, but it needs more evidence to make the finding that the United States' requests.  It undercuts the United States' evidence that Ortiz and Perez -- who were allegedly shot by Balderama -- never talked to Sanchez.  The Court wants to know why they neither testified before the Court nor even talked to Sanchez; there may be a good reason, but it is something that the Court would like to know before declaring a man guilty of murder.  Last, there are no independent, trustworthy facts to verify any part of any of the allegedly eyewitness testimony that Sanchez repeated before the Court.  Even the purported relationships between the principals -- e.g., that Gulindo was Balderama's girlfriend, a fact that might bolster her credibility, if true -- have only their own unsupported assertions on which to stand.

The preponderance standard does not merely ask who, between the two adversarial parties, put on the weightier, longer, or fancier case; it requires that the United States carry meaningful burdens of production and persuasion -- regardless what the Defendant may or may not present.  The Court has not applied the Federal Rules of Evidence to bar Sanchez' testimony, but it concerns the Court that all of the evidence that the United States presented would be inadmissible in a criminal trial -- none of the eyewitnesses were cross-examined, sworn, or even subject to repeated nonadversarial questioning.  No independent evidence was secured to attempt to build up the credibility of the hearsay declarants.  No motive was suggested, let alone proven.  Balderama may be a bad man and an inveterate criminal, but he has no history of homicide; the Court wants to know -- or at least hear strong, factually backed surmise -- about what turned him into a killer.  Last, the Court can think of myriad reasons for the others present at the scene of Villa's death -- who, for the most part, appear to know each other more closely than they know Balderama -- to frame Balderama.  Villa was a high-ranking gang member, and, even if none of the other witnesses killed him, they may have felt that if they did not pin the murder definitively on someone, Villa's gang might seek retaliation from all of them.  For these reasons, the United States has failed to carry its burden in proving that Balderama murdered a man in cold blood.

assaulted the officer while you were in custody for the murder charge[?]  THE DEFENDANT: Yes, sir.").

48.     Balderama pled guilty to aggravated assault on a peace officer with a deadly weapon, a third-degree felony, and was convicted on August 13, 2012.  See State v. Balderama, No. D-608-CR-201200051 (N.M. Dist. Ct.); Petition at 1.

49.     Balderama asserts that, even if he did not act in self-defense, the correctional officers deserved the assault in some way on account of their poor treatment of Balderama, see Balderama Letter at 2-5, but the Court finds, by a preponderance of the evidence -- including Balderama's own statement to the Court -- that Balderama committed a state felony by assaulting the correctional officer.

## PROCEDURAL HISTORY

1.     On September 30, 2005, the United States and Balderama entered into a Plea Agreement, filed September 30, 2005 (Doc. 46), in which Balderama agreed to plead guilty to being a felon in possession of a firearm under 18 U.S.C. §§ 922(g)(1), 924(a)(2).  See Plea Agreement at 2.  The Court convicted Balderama and sentenced him to 70-months imprisonment and three-years supervised release.  See Judgment at 1-3.  The Court imposed the standard conditions of supervision, as well as the following special conditions:

> The defendant shall not possess, have under his control, or have access to any firearm, explosive device, or other dangerous weapons, as defined by federal, state, or local law.

> The defendant must participate in and successfully complete a substance abuse treatment program which may include drug testing, outpatient counseling, or residential placement.  The defendant may be required to pay a portion of the cost of treatment and/or drug testing as determined by the Probation Office.

> The defendant must submit to a search of his person, property, or automobile under his control to ensure compliance with all conditions of

supervision.  He must inform any residents that the premises may be subject to a search.

The defendant must refrain from the use and possession of alcohol and other forms of intoxicants.  He must not frequent places where alcohol is the primary item for sale.

The defendant must participate in and successfully complete a mental health treatment program, which may include outpatient counseling, residential placement, or prescribed medication as approved by the probation officer.  The defendant may be required to pay a portion of the cost of this treatment as determined by the Probation Office.

Judgment at 4.  The Court waived the special penalty assessment and assessed no fine and no restitution; the only monetary sanction the Court levied on Balderama was a $100.00 assessment. See Judgment at 5.

2.     Balderama was released from custody on July 19, 2011, and began a three-year term of supervised release set to expire on July 18, 2014.  See Petition at 1.  On August 13, 2012, a New Mexico state court convicted Balderama of aggravated battery upon a peace officer with a deadly weapon, a third-degree felony.  See N.M. Stat. Ann. § 30-22-25C; State v. Balderama, No. D-608-CR-201200051 (N.M. Dist. Ct.); Petition at 1.  On April 16, 2014, the United States Probation Office ("USPO") issued the Petition seeking revocation of Balderama's supervised release.  See Petition at 1.  The Petition based its request both on Balderama's state felony conviction and on a number of prior positive drug tests -- for marijuana and methamphetamine -- failures to appear for drug testing, and failure to appear for substance-abuse counseling.  See Petition at 1.

3.     Balderama was arrested on April 25, 2014, see Arrest Warrant, filed April 29, 2014 (Doc. 69), and three days later the United States filed a Motion for Detention, filed April 28, 2014 (Doc. 66).  The Honorable Robert H. Scott, United States Magistrate Judge for the District of New Mexico, preliminarily detained Balderama and assigned him court-appointed

counsel.  See Clerk's Minutes - Initial on Petition, filed April 28, 2014 (Doc. 67).  On April 30, 2014, Judge Scott held a preliminary detention hearing, found probable cause of Balderama's violation, and remanded him to the United States Marshals Service.  See Clerk's Minutes - Preliminary/Detention on Petition, filed April 30, 2014 (Doc. 71).  Balderama pled guilty to his violations of supervised release on June 19, 2014.  See Guilty Plea at 1.  On July 18, 2014, after roughly three months in custody, Balderama filed the Contact Motion and the Sentencing Memo.

4.      Balderama's argument in the Contact Motion is that he has not seen his immediate family since November 7, 2011, and his sister, Veronica Meza, "is awaiting a liver transplant" and is in "dire medical condition."  Contact Motion ¶¶ 1, 4, at 1.  The United States opposes the Contact Motion, asking that the Court "defer to the judgment of the United States Marshals Service" on "inmate security issue[s]" such as this one.   Sealed Response to Defendant's Motion Requesting Contact Visit (Doc. 79) ¶ 3, at 1, filed July 21, 2014 (Doc. 81) ("Contact Visit Response").  The United States summarizes Balderama's criminal history, which includes instances of violence and escape from custody.  See Contact Visit Response ¶ 5, at 1-3. The United States points out that, on January 1, 2012, while Balderama was in custody, he "assaulted a correctional officer in the Grant County Detention Center with a metal pole." Contact Visit Response ¶ 8, at 4.  Last, it posits that Balderama "killed one person, and shot two other people," although the United States concedes that the State of New Mexico dismissed these charges.  Contact Visit Response ¶ 11, at 5.

5.      In his Sentencing Memo., Balderama presents two alternative arguments: first, that his supervised release cannot be revoked at all because his right to a speedy trial has been violated; and second, that, if the Court revokes his supervised release, the Court should impose his sentence concurrently to his state-court sentence.  Balderama argues that he was denied his

right to a speedy trial under the Sixth Amendment to the Constitution of the United States, because "[a]lthough federal authorities knew of the charged conduct since November 8, 2011, they waited approximately 30 months to bring him before the Court for hearing."  Sentencing Memo. at 5.  Balderama cites numerous cases for the proposition that the speedy-trial clock starts "when an accused is formally charged or arrested," but he cites no cases that deal with violations of supervised release.  Sentencing Memo. at 5 (quoting United States v. Johnson, 120 F.3d 1107, 1109 (10th Cir. 1997))(internal quotation marks omitted)(citing Barker v. Wingo, 407 U.S. 514 (1972); Doggett v. United States, 505 U.S. 647 (1992)).

6.     Balderama alternatively requests that the Court sentence him concurrently to his state-court sentence.  See Sentencing Memo. at 6-7.  In support for his contention that the Court has "discretion to impose consecutive or concurrent sentences," Balderama cites case law to the effect that the Guidelines' "policy statements regarding supervised release are advisory in nature."  Sentencing Memo. at 6 (citing United States v. Contreras-Martinez, 409 F.3d 1236, 1240 (10th Cir. 2005)).  Last, Balderama asks that the Court recommend that his sentence, if any, be served at a Cibola County, New Mexico facility, "due to death threats on his life from prison gangs that populate federal prisons."  Sentencing Memo. at 7.

7.     Balderama attached a handwritten note to the Sentencing Memo., in which he argues that he "was wrongly accused of a murder" of "a high Ranking member of a Prison Gang Called Sindicato Nuevo Mexico."  Balderama Letter at 1.  He asserts that the gun that was recovered by police on his person is "a 9mm gun[,] not the Murder weapon."  Balderama Letter at 1.  He further asserts that police finger-printed the gun, "and they did Find Prints on the clip But it wasnt [sic] my prints."  Balderama Letter at 1.  The Balderama Letter is not particularly easy to follow; it appears that Balderama asserts that he was at the scene of the killing, see

Balderama Letter at 1 ("I jumped out the Window when them guys Came in the bath Room pointing guns at me.  I Ran out the bath trying to get out the trailer cuz I was geting shot at."), but he does not specify the identity of the killer.  The remainder of the Balderama Letter is devoted to Balderama's fears of retaliation from Villa's family -- whom Balderama says blames him for the Villa's murder -- and from various correctional officers.  <u>See</u>, <u>e.g.</u>, Balderama Letter at 3 ("Them CO'S didnt like me cuz they Said I killed one of them. . . .  So the CO came to me door and told me that I'm a dead man and my family.").

8.      The United States responded to the Sentencing Memo. five days later.  <u>See</u> Sealed Response to Defendant's Sealed Sentencing Memorandum (Doc. 80), filed July 23, 2014 (Doc. 82)("Sentencing Response").  The United States first countered Balderama's speedy-trial argument, arguing both that (i) a defendant's speedy-trial clock does not start, on a revocation for supervised release, until the defendant is transferred into federal custody, <u>i.e.</u>, state custody does not count for speedy-trial purposes in the revocation context, <u>see</u> Sentencing Response ¶¶ 3-8, at 1-4; and (ii) Balderama "has already admitted violating the allegations in the Amended Petition to Revoke Supervised Release and is merely awaiting sentencing," Sentencing Response ¶ 11, at 5.  Next, the United States requests that the Court impose the statutory maximum -- 24-months imprisonment -- consecutive to Balderama's state-court sentence.  <u>See</u> Sentencing Response ¶¶ 12-36, at 5-12.  It contends that Balderama's "criminal history alone is reason to impose a term of imprisonment that is at the statutory maximum consecutive to Defendant's state . . . term." Sentencing Response ¶ 12, at 5.  Last, it contends that either Balderama's crime of conviction -- aggravated battery upon a peace officer -- or his unconvicted crimes -- which include second-degree murder -- would, on their own, justify a 24-month sentence, and, taken together, the need for a high sentence is even stronger.  <u>See</u> Sentencing Response ¶¶ 21-36, at 8-12.

9.      The United States submitted the Motion for Hearing on the same day as the Sentencing Response.  It argues that the Balderama Letter paints Balderama as a victim and requests that the Court hold an evidentiary hearing on Balderama's sentencing.  See Motion for Hearing ¶¶ 4-6, at 1-2.  The United States estimates that the hearing would take roughly an hour and would involve only one witness.  See Motion for Hearing ¶¶ 6-7, at 1-2.  Balderama objects to the Motion for Hearing, arguing that any evidence presented at such a hearing would be "irrelevant and immaterial to support violations alleged by the Government," and that Balderama "was not charged with a violation of supervised release concerning the murder charges, not provided with written notice of an alleged violation as to the [dismissed] charges."  Defendant's Response to United States' Request for an Evidentiary Hearing ¶¶ 5-6, at 2, filed July 24, 2014 (Doc. 84).

10.     The Court held a hearing on July 25, 2014, in which the Court first heard argument on the Motion for Hearing, see July 25 Tr. at 1:25-26:2 (Court, Lopez, Valencia), and then, after granting the Motion for Hearing, held the first portion of the evidentiary hearing, see July 25 Tr. at 26:10-57:21 (Court, Valencia, Sanchez, Lopez), with the remainder of the hearing being held on September 10, 2014, see Transcript of Hearing at 1:2-27:1 (taken September 10, 2014)("Sept. 10 Tr.")(Court, Lopez, Defendant, Valencia).  In opposing the Motion for Hearing, Balderama conceded that "the Court can consider anything, as per 18 [U.S.C. §] 3553," but he argued that "relitigating . . . a criminal case that's been dismissed by the state prosecutors[] would not be productive, and frankly would be a waste of time."  July 25 Tr. at 2:12-17 (Lopez). The Court noted that Balderama's Guidelines sentencing range was "way above what the statute provides for anyway," and asked whether "everybody just wanted to agree to the top end of the maximum, and be done with it."  July 25 Tr. at 3:1-2 (Court); id. at 3:5-9 (Court).  Balderama

agreed that the Guidelines indicated a sentence above the statutory maximum, see July 25 Tr. at 3:3 (Lopez), but contended that the primary issue for the Court to consider is whether to impose the sentence consecutively to or concurrently with Balderama's state-court sentence, see July 25 Tr. at 3:11-18 (Lopez).

11.     After some discussion, Balderama stipulated to a sentence of 24-months imprisonment -- the statutory maximum -- and confined his argument to requesting that the sentence be served concurrently with the seven-years imprisonment that the state court imposed upon him.  See July 25 Tr. at 5:18-25 (Lopez).  The United States took the opposite position, arguing that the Court's sentence should be imposed fully consecutively to the state-court sentence.  See July 25 Tr. at 10:25-11:4 (Court, Valencia).

12.     The Court asked Balderama about the circumstances of the assault upon a peace officer, and Balderama admitted that he had committed the assault, but contended that he did so out of both fear and a desire to retaliate against the correctional officers for doing things like "spit[ting] on [his] food."   July 25 Tr. at 20:4 (Defendant).   See id. at 19:25-20:2 (Court, Defendant).  Balderama also reiterated his Contact Motion's request that he be able to see and make contact with his sister, asserting that "she's waiting on a liver transplant, and I haven't seen her for a while."  July 25 Tr. at 20:12-15 (Defendant).

13.     The Court asked Balderama about his Sixth Amendment claim, noting that Balderama had "already ple[]d [guilty]," and inquiring whether Balderama was seeking to have the petition dismissed or was merely using the Sixth Amendment claim to argue for a shorter term of imprisonment.  July 25 Tr. at 3:4-10 (Court).  Balderama stated that he was only using the Sixth Amendment argument to seek a shorter prison term and not dismissal of the Petition, conceding that,

[i]f in fact the arrest warrant was served or executed at the time that is listed in the docket, which is 2014, then there is no claim or cannot be a claim for a Speedy Trial violation under federal law.

THE COURT:  But you're not raising this he's already pled, so you're not asking the petition to be dismissed or anything like that.  What you're asking is it goes to the calculation again.

MR. LOPEZ:  Correct.  And Your Honor for the record and I'm stating this, I'm trying to be as diplomatic as possible.  I made the argument pursuant to the Anders case.

THE COURT:  Okay, all right.

MR. LOPEZ:  My client asked me to make that argument.  He made that argument in a letter to me in anticipation of the sentencing.  I told him I would present it to the Court I've presented it to the Court.

July 25 Tr. at 21:23-22:16 (Lopez, Court).

14.     The Court next allowed the United States to present its sole witness, Sanchez, to testify to the events surrounding Villa's murder.  <u>See</u> July 25 Tr. at 26:10-57:21 (Court, Valencia, Sanchez, Lopez).  In doing so, the Court effectively granted the Motion for Hearing. Sanchez' testimony described his process of investigating Villa's murder, which primarily entailed interviewing the on-scene witnesses.  These witnesses' statements are described in the Findings of Facts section of this Memorandum Opinion and Order.  Sanchez' testimony concluded by asserting that "[a]ll [his] witnesses had disappeared.  They wouldn't answer their phones.  They weren't . . . living [at] the addresses that they had given for contact [information]." July 25 Tr. at 33:4-7 (Sanchez).  As such, virtually all of Sanchez' testimony was hearsay and double hearsay from eyewitnesses to which Sanchez talked only once.

15.     The parties reconvened for the second half of the hearing on September 10, 2014. After briefly discussing the evidence, the Court ruled that it would impose Balderama's 24-month term of imprisonment for his violations of supervised release consecutively to the state-

court term of imprisonment, but that it could not find, by a preponderance of the evidence, that

Balderama murdered Villa.

> The Court[,] having listened [to the] evidence[,] is not convinced it can find by a preponderance of the evidence that Mr. Balderama committed murder in the Grant County case.  But a lot of the testimony does concern the Court[,] as well as the actual crime [aggravated assault on a peace officer] for which he has been sentenced.  Yes, he's been punished by the state, [but] the evidence that the Government has presented remains trouble[ing,] as well as the criminal history of the defendant.  And so after careful consideration of this, the Court has decided to sentence Mr. Balderama to the 24 months.  But it's also going to run that sentence consecutively to the state sentence.  The Court believes that the federal sentence should mean something[,] and if it just runs it concurrently it really means very little, and I'm not going to reimpose supervised release.  And so I think we're going to bring the supervised release to an end.  The  guideline range is really quite above the 24 months and so I think that also counsels some to run this consecutively or otherwise violation of the supervised release in Federal Court would not mean anything in Mr. Balderama's case.  And so the Court believes that a sentence of 24 months reflects the seriousness of the offense, it's also necessary to run it consecutively to promote respect for the law, the Court believes that provides a just punishment particularly given that it's not going to reimpose supervised release afford adequate deterrence both at a specific and general level, protect the public, the defendant does have a very troubling criminal history[, e]ven if I don't find [--] which I don't [--] that he committed murder in the case in [G]rant [C]ounty.  It avoids unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct.  Because this is the policy of the guidelines[:] to run these consecutively.  And because I'm not going to impose supervised release, I think this sentence fully and effectively reflects each of the relevant factors in 18 USC Section 3553(a).

Sept. 10 Tr. at 17:22-19:13 (Court).  The Court also made a recommendation that Balderama

serve his sentence at the federal facility in Tucson, Arizona.  See Sept. 10 Tr. at 20:10-21

(Lopez, Court, Probation Officer).

## CONCLUSIONS OF LAW

Having outlined its Findings of Fact, the Court will now make Conclusions of Law.  The

Court will first outline the applicable law, in Part I, and then analyze this case's facts, in Part II.

- 19 -

I.      **LAW REGARDING SUPERVISED RELEASE**

1.      A court, "in imposing a sentence to a term of imprisonment for a felony or a misdemeanor, may [and sometimes must] include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment."  18 U.S.C. § 3583(a). When a defendant is on supervised release, he is legally bound to abide by certain conditions of his release.  See 18 U.S.C. § 3583(d).  A court may then

> revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release . . . without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release . . . .

18 U.S.C. § 3583.  In other words, there is a period of time after release during which, if the defendant does not behave properly, the court may impose further imprisonment.  A district court's decisionmaking with regard to supervised release come in three phases: (i) at sentencing, the court must decide whether to impose the sentence and, if so, how long a term to impose and what conditions to associate with it; (ii) while the defendant is on supervised release, if the United States accuses the defendant of violating a condition of supervised release, the Court must determine whether the defendant has violated the conditions, whether to revoke supervised release, and, if so, what punishment to impose for the violation; and (iii) also while the defendant is on supervised release, the Court may decide to terminate the supervised release -- i.e., to end the defendant's supervised-release term earlier than it was set to expire at sentencing.

A.      **IMPOSITION OF SUPERVISED RELEASE.**

2.      The Court is to use the usual § 3553(a) factors as its guide in imposing a term of supervised release.  See 18 U.S.C. § 3583(c).  Application note 1 to U.S.S.G. § 7B1.4 provides that "[t]he criminal history category to be used in determining" the sentence for revocation of

supervised release "is the category determined at the time the defendant originally was sentenced to the term of supervision."   U.S.S.G. § 7B1.4 cmt. n.1.   The Guidelines' commentary is generally an authoritative interpretation of the rules contained therein.   See Stinson v. United States, 508 U.S. 36, 38 (1993).   Chapter Seven of the sentencing Guidelines -- which deals with supervised release -- has always been advisory rather than mandatory, even before United States v. Booker, 543 U.S. 220 (2005).   See United States v. McClanahan, 136 F.3d 1146, 1149 (7th Cir. 1998).   As the United States Court of Appeals for the Tenth Circuit has explained: "Section 7B1.4(a) is therefore not a sentencing guideline per se; it is merely a 'policy statement.'"   United States v. Hurst, 78 F.3d 482, 483 (10th Cir. 1996).   "In dealing with violations of supervised release the Sentencing Commission chose to issue policy statements rather than guidelines, in order to permit evaluation after experience with the new supervised release concept."   United States v. Boling, 947 F.2d 1461, 1462 (10th Cir. 1991).   "While the Chapter Seven policy statements are entitled to 'great weight,' they do not bind the sentencing judge; while they are an 'element in his exercise of discretion,' they are not a substitute for that discretion."   United States v. McClanahan, 136 F.3d at 1149.

3.     Subsection (d) of § 3583 sets forth some of the standard and discretionary conditions that courts shall and may impose as a part of supervised release:

> **Conditions of supervised release.** -- The court shall order, as an explicit condition of supervised release, that the defendant not commit another Federal, State, or local crime during the term of supervision and that the defendant not unlawfully possess a controlled substance.   The court shall order as an explicit condition of supervised release for a defendant convicted for the first time of a domestic violence crime as defined in section 3561(b) that the defendant attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, in consultation with a State Coalition Against Domestic Violence or other appropriate experts, if an approved program is readily available within a 50-mile radius of the legal residence of the defendant.   The court shall order, as an explicit condition of supervised release for a person required to register under the Sex Offender Registration and Notification Act, that the person

comply with the requirements of that Act.  The court shall order, as an explicit condition of supervised release, that the defendant cooperate in the collection of a DNA sample from the defendant, if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000.  The court shall also order, as an explicit condition of supervised release, that the defendant refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days of release on supervised release and at least 2 periodic drug tests thereafter (as determined by the court) for use of a controlled substance. The condition stated in the preceding sentence may be ameliorated or suspended by the court as provided in section 3563(a)(4).  The results of a drug test administered in accordance with the preceding subsection shall be subject to confirmation only if the results are positive, the defendant is subject to possible imprisonment for such failure, and either the defendant denies the accuracy of such test or there is some other reason to question the results of the test.  A drug test confirmation shall be a urine drug test confirmed using gas chromatography/mass spectrometry techniques or such test as the Director of the Administrative Office of the United States Courts after consultation with the Secretary of Health and Human Services may determine to be of equivalent accuracy.  The court shall consider whether the availability of appropriate substance abuse treatment programs, or an individual's current or past participation in such programs, warrants an exception in accordance with United States Sentencing Commission guidelines from the rule of section 3583(g) when considering any action against a defendant who fails a drug test.  The court may order, as a further condition of supervised release, to the extent that such condition--

    **(1)**    is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);

    **(2)**    involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and

    **(3)**    is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a);

any condition set forth as a discretionary condition of probation in section 3563(b) and any other condition it considers to be appropriate, provided, however that a condition set forth in subsection 3563(b)(10) shall be imposed only for a violation of a condition of supervised release in accordance with section 3583(e)(2) and only when facilities are available.  If an alien defendant is subject to deportation, the court may provide, as a condition of supervised release, that he be deported and remain outside the United States, and may order that he be delivered to a duly authorized immigration official for such deportation.  The court may order, as an explicit condition of supervised release for a person who is a felon and required to register under the Sex Offender Registration and Notification Act, that the person

submit his person, and any property, house, residence, vehicle, papers, computer, other electronic communications or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the person, and by any probation officer in the lawful discharge of the officer's supervision functions.

18 U.S.C. § 3583(d).

## B.    REVOCATION OF SUPERVISED RELEASE.

4.    Section 3583 of Title 18 of the United States Code specifies the conditions of supervised release, but elsewhere Congress has provided for other conduct which, if committed by a defendant on supervised release, can result in a revocation of supervised release.  The express terms in § 3583 include that the defendant not commit another federal, state, or local crime during the term of supervision, that the defendant not possess any controlled substances, and that the defendant cooperate in the collection of a DNA sample from the defendant, among others.  See 18 U.S.C. § 3583(d).  Among those conditions not listed in Section 3583 is that supervised release may be revoked if the defendant fails to pay a fine or restitution that the court has imposed.  See 18 U.S.C. § 3613A ("Upon a finding that the defendant is in default on a payment of a fine or restitution, the court may, pursuant to section 3565, revoke probation or a term of supervised release . . . .").

5.    Subsection (e)(2) of § 3583 sets forth the process for revoking supervised release:

(e)    **Modification of conditions or revocation.** -- The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) --

. . . .

(3)    revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the

court, pursuant to the Federal Rules of Criminal Procedure
applicable to revocation of probation or supervised release,
finds by a preponderance of the evidence that the defendant
violated a condition of supervised release, except that a
defendant whose term is revoked under this paragraph may
not be required to serve on any such revocation more than 5
years in prison if the offense that resulted in the term of
supervised release is a class A felony, more than 3 years in
prison if such offense is a class B felony, more than 2 years
in prison if such offense is a class C or D felony, or more
than one year in any other case . . . .

18 U.S.C. § 3583(e).  The court must find all violations of supervised release by a preponderance

of the evidence, regardless whether the violative conduct itself constitutes criminal conduct.  See

18 U.S.C. § 3583(e).  This standard is different from the ones that apply to a defendant's release

pending trial -- mere probable cause for criminal violations and the clear-and-convincing

standard for noncriminal violations of conditions of pretrial release.  See 18 U.S.C. § 3148(b)(1).

6.     A court may clarify for the defendant what the terms of his or her supervised

release entail.  Generally, the district court has a duty to ensure, to the best of its ability, that the

defendant complies with the terms of his supervised release.  See United States v. Guanipa, 322

F. App'x 831, 832 (11th Cir. 2009)("[U]nder 18 U.S.C. § 3583, district courts retain the ultimate

responsibility for ensuring that a defendant has complied with the conditions of her supervised

release.").  The advisory committee to the Federal Rules of Criminal Procedure has stated: "The

probationer [and, presumably, the defendant on supervised release] should have the right to

apply to the sentencing court for a clarification or change of conditions."  Fed. R. Crim. P.

32.1(b), advisory committee notes (citing American Bar Association, Standards Relating to

Probation § 3.1(c) (approved draft, 1970)).  See United States v. Raymer, 148 F. App'x 555, 557

(7th Cir. 2005)("Raymer . . . sought clarification of the conditions of supervised release, which is

a legitimate basis for a motion.").  Federal Rule of Criminal Procedure 32.1 "permits a defendant

to move for 'clarification of a term or condition of supervised release so that the defendant may have an opportunity to comply with the court's order without first having to violate it.'"  United States v. Raymer, 148 F. App'x at 557 (quoting United States v. Lilly, 206 F.3d 756, 762 (7th Cir. 2000)).

### C.  EARLY TERMINATION OF SUPERVISED RELEASE.

7.  The United States Court of Appeals for the Eleventh Circuit has stated:

> The primary goal of supervised release is to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period of time in prison for punishment or other purposes but still needs supervision and training programs after release.

United States v. Pugh, 515 F.3d 1179, 1199 (11th Cir. 2008)(alterations omitted)(quoting S. Rep. No. 98-225, at 124 (1984), reprinted in 1984 U.S.C.C.A.N. 3182)(internal quotation marks omitted).  "Congress intended supervised release to assist individuals in their transition to community life.  Supervised release fulfills rehabilitative ends, distinct from those served by incarceration."  United States v. Johnson, 529 U.S. 53, 59 (2000)(citing S. Rep. No. 98-225, at 124).  Congress prohibits incarcerating an offender for rehabilitation purposes, but in contrast, a court may consider an offender's need for rehabilitation in prescribing supervised-release conditions.  See United States v. Burgos, 276 F.3d 1284, 1290 n.6 (11th Cir. 2001); United States v. Vigil, No. 05-2051, 2010 WL 2301708, at *9 (D.N.M. May 4, 2010)(Browning, J.).

8.  "Whether to grant a motion to terminate a term of supervised release under § 3583(e)(1) is a matter of district court discretion."  Rhodes v. Judiscak, 653 F.3d 1146, 1148 (10th Cir. 2011)(citing United States v. Lowe, 632 F.3d 996, 998 (7th Cir. 2011)).  "Abuse of discretion occurs when the district court commits a serious error of judgment, such as the failure to consider an essential factor."  United States v. Lowe, 632 F.3d at 997.  Under 18 U.S.C.

§ 3583(e)(1), "[a] district court may grant an early termination of a remaining term of supervised release after one year of supervised release has elapsed and after the court considers certain factors in 18 U.S.C. § 3553(a), if the defendant's conduct and the interests of justice so warrant." United States v. Lowe, 632 F.3d at 998 (citing 18 U.S.C. § 3583(e)(1)).  The United States Court of Appeals for the Seventh Circuit has stated:

> Section 3583(e) in general requires a district court to consider certain factors in § 3553(a) before it can: (1) terminate a term of supervised release and discharge the defendant; (2) extend or otherwise modify the conditions of a term of supervised release; (3) revoke a term of supervised release and require the defendant to serve the remaining time in prison; or (4) order a defendant on house arrest during nonworking hours.

United States v. Lowe, 632 F.3d at 998 (citing 18 U.S.C. § 3583(e)).  Accord United States v. Vargas, 564 F.3d 618, 622-23 (2d Cir. 2009).  The Seventh Circuit held that a district court abused its discretion in applying this statute when it applied a general "policy of refusing to grant a motion for early termination of supervised release unless a defendant has twelve months or less remaining on his term of supervised release."  United States v. Lowe, 632 F.3d at 998-99.  As a general matter, a district court may properly consider as a factor the length of time the defendant has served on supervised release.  See United States v. Reagan, 162 F. App'x 912, 914 (11th Cir. 2006)(recognizing that the district court could properly consider "the small fraction of the term served").  Based on the language in 18 U.S.C. § 3583(e)(1) that a district court must be "satisfied that such action is warranted by the conduct of the defendant released and the interest of justice," the district court may consider the defendant's conduct and circumstances while he is on supervised release in determining whether to terminate early a term of supervised release.  See United States v. Perry, 397 F. App'x 521, 522 (11th Cir. 2010)(quoting 18 U.S.C. § 3583(e)(1)).

## II.   ANALYSIS

9.     The Court will deny the Contact Motion, grant the Motion for Hearing, and sentence Balderama to 24-months imprisonment, to run consecutively to his state-court sentence. The Court concludes that Balderama's revocation does not run afoul of the Sixth Amendment. Also, although the United States has presented insufficient evidence for the Court to find, by a preponderance of the evidence, that Balderama committed the murder with which the State of New Mexico charged him, the Court will still run Balderama's sentence for violating the conditions of his supervised release consecutively to his state-court sentence.

### A.   THE COURT WILL DENY THE CONTACT MOTION, LEAVING THE QUESTION TO THE UNITED STATES MARSHALS SERVICE'S DISCRETION.

10.     The Court will deny the Contact Motion and leave the question to the United States Marshals Service's sound discretion.  In Block v. Rutherford, 468 U.S. 576 (1984), the Supreme Court of the United States held that district courts must defer to jailers' policies regarding contact visits.  In that case, a federal district court sustained a class-action civil-rights challenge to a Los Angles, California jail's policy of denying contact visits.  See 468 U.S. at 578. The Supreme Court, in a 6-3 opinion that the Honorable Warren E. Burger, then-Chief Justice of the United States, authored, held that the district court had "impermissibl[y] substitute[ed] its view on the proper administration of the Central Jail for that of the experienced administrators of that facility."  468 U.S. at 589.  Chief Justice Burger wrote that, if "responsible experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility," "the Constitution does not require that detainees be allowed contact visits."  468 U.S. at 589.  The Tenth Circuit has noted that "visits between inmates and their visitors provide a unique opportunity for passing contraband, including weapons and drugs, into

the prison," and, although avoiding the question whether prisoners have any right at all to contact visits, implied that courts should uphold facilities' policies against them unless it can be "'conclusively' show[n] that the prison officials were wrong" or their "restrictions imposed on contact visitation are irrational."    Ramos v. Lamm, 639 F.2d 559, 580 (10th Cir. 1980)(Holloway, J.).

11.    Here, Balderama has not alleged that his jailer's refusal to allow him a contact visit is irrational or conclusively wrong.  Examining the issue itself, the Court concludes that the policy is rational and correct.  Balderama has been convicted of what are perhaps the two most concerning categories of crime for a prisoner to have in his history: (i) he has escaped from jail, see PSR ¶ 32, at 10; and (ii) he has assaulted correctional officers with a deadly weapon, see July 25 Tr. at 19:25-21:1 (Court, Defendant).  Balderama has given his jailers reason for concern, and, under Supreme Court and Tenth Circuit precedent, it is not the Court's place to interfere with their judgment vis-à-vis the conditions of Balderama's visits with his family.  The Court, therefore, denies the Contact Motion.

**B.    THE COURT WILL GRANT THE MOTION FOR HEARING, BECAUSE THE FACTS SURROUNDING BALDERAMA'S CONDUCT IS REASONABLY IN DISPUTE.**

12.    The Court grants the Motion for Hearing, because facts potentially "important to the sentencing determination [are] reasonably in dispute."  U.S.S.G. § 6A1.3(a).  The Court's discretion to grant evidentiary hearings in this situation is nigh absolute, and, although situations may arise where the courts must hold an evidentiary hearing, the Court has not found any precedent describing situations in which courts must deny requests for evidentiary hearings.  Under rule 32.1(b)(2), defendants have a right to a revocation hearing, but Balderama waived that right by pleading guilty.  See Fed. R. Crim. P. 32.1(b)(2).  The Motion for Hearing, thus,

requests a sentencing hearing and not a revocation hearing.  The Tenth Circuit described the

circumstances when a district court should grant such a hearing:

> [T]he district court is free to order an evidentiary hearing on remand, should the
> facts warrant such a hearing under 18 U.S.C. § 3661, Federal Rule of Criminal
> Procedure 32(i)(2),29 and/or § 6A1.3(a) of the Sentencing Guidelines.  As the
> commentary to § 6A1.3 indicates, "[a]n evidentiary hearing may sometimes be
> the only way to resolve disputed issues," and if the calculation of loss for
> purposes of the Guidelines or restitution presents the complex factual issues that
> the district court understood it to, this may be such a case.  See United States v.
> Roberts, 14 F.3d 502, 521 (10th Cir. 1993)(suggesting that, given difficulty of
> calculating drug quantity for Guidelines purposes, district court should hold
> evidentiary hearing).

United States v. Gallant, 537 F.3d 1202, 1246-47 (10th Cir. 2008)(footnotes omitted).  The first

of the three sources that the Tenth Circuit identified as guides to district courts' determinations

whether to grant an evidentiary hearing at sentencing is titled "use of information for

sentencing," and provides: "No limitation shall be placed on the information concerning the

background, character, and conduct of a person convicted of an offense which a court of the

United States may receive and consider for the purpose of imposing an appropriate sentence."

18 U.S.C. § 3661.  The second source provides only that, at sentencing, "[t]he court may permit

the parties to introduce evidence on the objections."  Fed. R. Crim. P. 32(i)(2).  These two

standards are purely permissive and place no limitations on the district court's discretion to either

grant or deny hearings.  The third source comes the closest to placing tangible restrictions on --

or offering meaningful guidance to -- district courts:

> (a)   When any factor important to the sentencing determination is reasonably
> in dispute, the parties shall be given an adequate opportunity to present
> information to the court regarding that factor.  In resolving any dispute
> concerning a factor important to the sentencing determination, the court
> may consider relevant information without regard to its admissibility
> under the rules of evidence applicable at trial, provided that the
> information has sufficient indicia of reliability to support its probable
> accuracy.

> (b)     The court shall resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(i), Fed. R. Crim. P.
>
> Although lengthy sentencing hearings seldom should be necessary, disputes about sentencing factors must be resolved with care.  When a dispute exists about any factor important to the sentencing determination, the court must ensure that the parties have an adequate opportunity to present relevant information.  Written statements of counsel or affidavits of witnesses may be adequate under many circumstances.  An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues.  The sentencing court must determine the appropriate procedure in light of the nature of the dispute, its relevance to the sentencing determination, and applicable case law.
>
> In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial.  Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy.  Out-of-court declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means.  Unreliable allegations shall not be considered.

U.S.S.G. § 6A1.3(a) & cmt. (citations omitted).   There are two caveats to the Guidelines' standard.  First, although the Guidelines use mandatory language in providing that the district court "shall" allow parties to "present information," "an adequate opportunity" does not necessarily mean a full evidentiary hearing -- unless the district court finds that only an evidentiary hearing would be "adequate" under the circumstances.  Second, the Guidelines' standard places some limitation on district courts' discretion to deny requests for evidentiary hearings, but does not curb courts' discretion to grant such hearings.  Thus, if a district court wants to hold an evidentiary hearing to aid in sentencing, the court can do so.

13.     The Court will grant the Motion for Hearing; as the Court has already held the hearing, it would perhaps be more accurate to say that the Court has granted the Motion for Hearing.  The United States promised the Court a short hearing, see Motion for Hearing ¶ 7, at 2 ("The United States estimates that it would take an hour to present the testimony . . . ."), and it delivered on that promise, see Violation of Supervision Proceedings Minute Sheet, filed July 25,

2014 (Doc. 85)(calculating the total time in court on July 25, 2014 -- including testimony, argument, and breaks -- to be one hour and twenty-six minutes); Sentencing Minute Sheet on Violation of Supervised Release, filed September 10, 2014 (Doc. 89)(calculating the total time in court on September 10, 2014 to be thirty-nine minutes).  Weighing this modest use of judicial time and resources against the potential value of the Court learning about one of its supervisee's involvement in a gang murder, the Court concludes that an evidentiary hearing is worth the time. The Court, thus, grants the Motion for Hearing.

### C.   THE COURT WILL SENTENCE BALDERAMA TO 24-MONTHS IMPRISONMENT, SUCH SENTENCE TO RUN CONSECUTIVELY TO HIS STATE-COURT SENTENCE.

14.     The Court will sentence Balderama to 24-months imprisonment and require that the term be served consecutive to his state-court sentence.  The Court comes to this decision based on the severity of Balderama's criminal record and his multiple violations of supervised release, and does not base its decision upon the murder allegations that the United States levies against him -- allegations that the Court finds lack support from a preponderance of the evidence. There are four analytical steps in sentencing Balderama, but Balderama has waived or conceded three of them.  First, the Court must find that Balderama violated the conditions of his supervised release.  Balderama waived this finding by pleading guilty.  Second, the Court must determine whether revocation would violate Balderama's Sixth Amendment right to a speedy trial. Balderama concedes that it would not, and that his Sixth Amendment argument goes only to length of imprisonment, and not to the validity of the revocation.[6]   Third, the Court must

---

[6]Balderama conceded at the hearing that, "[i]f in fact the arrest warrant was served or executed at the time that is listed in the docket, which is 2014, then there is no claim or cannot be a claim for a Speedy Trial violation under federal law."   July 25 Tr. at 21:23-22:2 (Lopez). Balderama presents, and the Court has, no reason to doubt the accuracy of the dates on the

_____

CM/ECF docket sheet.  The following exchange sheds some light on the circumstances in which Balderama raised this argument:

> THE COURT:  But you're not raising this [--] he's already pled, so you're not asking the petition to be dismissed or anything like that.  What you're asking is it goes to the calculation again.

> MR. LOPEZ:  Correct.  And Your Honor for the record and I'm stating this, I'm trying to be as diplomatic as possible.  I made the argument pursuant to the Anders case.

July 25 Tr. at 22:3-10 (Court, Lopez).  "[T]he Anders case" likely refers to Anders v. State of California, 386 U.S. 738 (1967), which stands for the proposition that a court-appointed criminal-defense attorney must act "in the role of an advocate, rather than as amicus curiae," and must advocate on the defendant's behalf even if the attorney believes the arguments lack merit. 386 U.S. at 741.  The New Mexico courts have expanded this concept to require that a criminal-defense attorney raise essentially any argument that the client wants raised.  See State v. Boyer, 1985-NMCA-029, ¶¶ 17-24, 712 P.2d 1, 4-6 ("An attorney should first seek to convince the client of the wisdom of the attorney's professional judgment.  But, failing such persuasion, the client's contention should be presented.").  New Mexico construes Anders v. State of California's unusually liberally, and while the New Mexico courts' construction of the rule does not bind practitioners in federal court, the Court can understand how a member of the State Bar of New Mexico would feel duty-bound by New Mexico state-court precedent outlining New Mexico attorneys' "ethical consideration[s]," even in federal court.  State v. Boyer, 1985-NMCA-029, ¶ 17, 712 P.2d at 4.  Balderama's attorney described this situation in his next breath at the hearing: "My client asked me to make that argument.  He made the argument in a letter to me in anticipation of sentencing.  I told him I would present it to the Court[.]  I've presented it to the Court."  July 25 Tr. at 22:12-16 (Lopez).

Even if Balderama had not conceded this argument, it would -- as Balderama's attorney acknowledged -- be without a sound basis in the law.  In a Sixth Amendment speedy-trial claim,

> [t]he first factor, length of delay, functions as a gatekeeper.  We examine these other factors only if a delay is long enough to be presumptively prejudicial.  Delays approaching one year generally satisfy the requirement of presumptive prejudice.  The length of delay is measured from the time at which the speedy trial right attaches: the earlier of either arrest or indictment.

United States v. Batie, 433 F.3d 1287, 1290 (10th Cir. 2006)(McConnell, J.).  See Heath v. United States, 788 F.2d 85, 91 (2d Cir. 1986)("Placing a detainer against a parolee who has been arrested on an intervening charge does not constitute execution of the warrant.").  Balderama was arrested on April 29, 2014, and pled guilty on June 19, 2014 -- less than two months later.  See Arrest Warrant, filed April 29, 2014 (Doc. 69)(stating that Balderama was arrested on April 29, 2014); Guilty Plea at 1.  He thus cannot establish a Sixth Amendment speedy-trial violation.

Although Balderama's sole speedy-trial argument is under the Sixth Amendment and not the Speedy Trial Act, 18 U.S.C. §§ 3161-3174, see July 25 Tr. at 21:11-15 (Court, Lopez)("What

determine whether to revoke Balderama's supervised release and what term of imprisonment to impose. Balderama's Guidelines sentencing range is above the statutory maximum, see U.S.S.G. § 7B1.4(a) (indicating a sentencing range of 33-41 months for offenders, like Balderama, in criminal history category VI who commit Grade A[7] violations), and, accordingly, Balderama stipulates to a sentence at the statutory maximum of 24-months imprisonment, see July 25 Tr. at 5:18-22 (Lopez)("Judge after consulting with my client, I think he's inclined to stipulate to the maximum statutory penalty of two years . . . ."). The fourth and final question -- and the only live question before the Court -- is whether to impose Balderama's 24-month sentence concurrently with his state-court conviction or consecutively to it. Under the Guidelines --

I understand . . . is that you're not alleging violations of the Speedy Trial [A]ct[;] you're alleging violations of the Sixth Amendment Speedy Trial; is that correct[?]  MR. LOPEZ:  That is correct, Your Honor . . . ."), the Court also concludes that the United States did not violate Balderama's rights under the Speedy Trial Act.

> [T]he Speedy Trial Act applies to defendants arrested for a new offense, [but] it does not apply to the lodging of detainers.  Instead, any proceeding on [the defendant's] violation of supervised release, for which the arrest warrant was issued, may wait until completion of his state sentence.  Moody v. Daggett, 429 U.S. 78, 89 (1976).  In other words, because [the defendant] is not in federal custody, he does not have a right to a revocation hearing or otherwise a "speedy trial" on such an issue.  See United States v. Fay, 547 F.3d 1231, 1236 (10th Cir. 2008); McDonald v. New Mexico Parole Bd., 955 F.2d 631, 633-34 (10th Cir. 1991).  Similarly, the Interstate Agreement on Detainers Act, which requires immediate transfer of a prisoner to another jurisdiction when there are detainers lodged on untried criminal charges, clearly does not apply to supervised release revocation detainers.

United States v. Gomez-Diaz, 415 F. App'x 890, 894 (10th Cir. 2011)(unpublished)(citations omitted).  The Speedy Trial Act, thus, does not apply to violations of supervised release. Balderama, therefore, has neither a colorable statutory nor constitutional speedy-trial argument.

[7]"Grade A Violations" include any "federal, state, or local offense punishable by a term of imprisonment exceeding one year that (i) is a crime of violence . . . ."  U.S.S.G. § 7B1.1(a)(1). Aggravated battery upon a peace officer is a violent felony.  See N.M. Stat. Ann. § 30-22-25C ("Whoever commits aggravated battery upon a peace officer . . . with a deadly weapon . . . is guilty of a third degree felony."); id. § 30-1-6A ("A crime is a felony if . . . a sentence of death or of imprisonment for a term of one year or more is authorized.").

- 33 -

advisory though they are -- sentences on revocations of supervised release should always be imposed consecutively to sentences arising out of direct prosecution for the underlying conduct:

> (f)     Any term of imprisonment imposed upon the revocation of probation or supervised release shall be ordered to be served consecutively to any sentence of imprisonment that the defendant is serving, whether or not the sentence of imprisonment being served resulted from the conduct that is the basis of the revocation of probation or supervised release.
>
> . . . .
>
> 4.     Subsection (f) provides that any term of imprisonment imposed upon the revocation of probation or supervised release shall run consecutively to any sentence of imprisonment being served by the defendant. Similarly, it is the Commission's recommendation that any sentence of imprisonment for a criminal offense that is imposed after revocation of probation or supervised release be run consecutively to any term of imprisonment imposed upon revocation.

U.S.S.G. § 7B1.3(f) & cmt. 4 (emphases added).

15.     Even excluding from consideration the possibility that Balderama murdered a man while on supervised release, the Court will still impose the full 24-month sentence to run consecutively to the state-court sentence.  A consecutive sentence honors the Guidelines' stated policy of imposing consecutive sentences, and, in following the Guidelines, the Court is more likely to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Additionally, the Court is not merely applying a Guidelines-suggested sentence in the consecutive manner that the Guidelines suggest; the Guidelines would, but for the statutory maximum, suggest a much higher sentence and suggest that the Court apply it consecutively.  Balderama is already effectively receiving one break from the Guidelines by virtue of the statute; for the Court to give Balderama a second break, by applying his sentence concurrently, would result in a sentence that is not "sufficient . . . to comply with the purposes set forth in" § 3553(a)(2).  18 U.S.C. § 3553(a).  If

the sentence were to run concurrently, Balderama would effectively go unpunished for his violation of supervised release.  Balderama did not comply with the conditions under which the Court agreed to supervise -- rather than incarcerate -- him, and he violated the conditions under which he was required to serve his sentence.  He deserves to be punished on these grounds, separately from the normal punishment for having committed a crime.  In addition, the Court will not impose another term of supervised release on Balderama -- the Court thinks that the largely rehabilitative purposes of supervised release are not being achieved in Balderama's case[8] -- and so it is fair that Balderama should receive some additional imprisonment, given that he will another term of supervised release.  The Court, therefore, sentences Balderama to a 24-month term of imprisonment, to be served consecutively to his state-court term of imprisonment.

**IT IS ORDERED** that: (i) the Sealed Motion Requesting Contact Visit, filed July 18, 2014 (Doc. 79), is denied; (ii) the Opposed Request for an Evidentiary Hearing, filed July 23, 2014 (Doc. 83), is granted; and (iii) Defendant Alejandro Balderama is sentenced to 24-months imprisonment to run consecutively to the term of imprisonment imposed in State v. Balderama, No. D-608-CR-201200051 (N.M. Dist. Ct.), in the Sixth Judicial District Court, Grant County, New Mexico.

_____
UNITED STATES DISTRICT JUDGE

---

[8]While it is disappointing that supervised release has not worked on Balderama, there is no need for the Court to stay a course that has shown no promise of working; supervised release can waste precious judicial resources when it does not produce any concomitant benefits. Balderama is not reforming, and he is not amenable to rehabilitation by way of supervised release.

*Counsel*:

Damon P. Martinez
    United States Attorney
Louis E. Valencia
    Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Martin Lopez, III
Albuquerque, New Mexico

       *Attorney for the Defendant*